## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**JAMES O. WARD, JR.,**<br><br>**Defendant.** | Civil Action No.:<br><br>**JURY DEMAND** |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("Plaintiff", "Commission", or "SEC"), alleges the following:

## OVERVIEW

1. Between at least March and September 2021, James O. Ward, Jr. ("Ward" or "Defendant") participated in the offer and sale of at least $852,000 in securities issued by Apex Financial Institute Pvt. Ltd. ("Apex"), a private fund, to at least 70 investors.

2. In offering and selling these securities, Ward promoted Apex as an actual hedge fund, and falsely claimed, among other things, that Apex: (i) was regulated by the SEC; (ii) had $25 million in assets under management; (iii) had

successfully conducted a 12-month beta test of its trading strategies; (iv) employed trading strategies that offered investors the opportunity to experience substantial gains without any risk of loss; and (v) had several international offices.

3. In reality, Apex was never an SEC-regulated entity, did not exist prior to February 2021, had no assets under management and had not conducted any testing of its investment strategies before receiving investor funds, did not have trading strategies that protected investors from losses, and operated entirely from Ward's and his partners' home computers.

4. Moreover, a key component of Ward's sales pitch was the "Apex Financial Token," which Ward falsely claimed was pegged to the U.S. dollar. In fact, there was no token.

5. Ward also touted his own credibility and integrity, telling prospective investors that he would never be involved in an illegitimate enterprise. Yet he failed to disclose that he previously had engaged in a $20 million Ponzi scheme and directed accomplices to destroy documents after receiving a subpoena from the Federal Trade Commission ("FTC") relating to that Ponzi scheme.

6. Apex invested the majority of investor proceeds in third-party funds. From the outset, these investments sustained substantial losses.

7. In or around September 2021, Apex stopped accepting investments and subsequently began to wind down its operations.

8.      In connection with that shut down, Ward's two Apex partners used their personal funds to help repay investors.

## **VIOLATIONS**

9.      Defendant has engaged in acts or practices that violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)] and Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. §78j(b)] ("Exchange Act") and Rule 10b-5 thereunder [17 C.F.R §240.10b-5].

10.     Unless restrained and enjoined by this Court, Defendant will continue to engage in acts and practices that violate this provision.

## **JURISDICTION AND VENUE**

11.     The Commission brings this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendant from engaging in the transactions, acts, practices, and courses of business alleged in this complaint, and transactions, acts, practices, and courses of business of similar purport and object, for civil penalties, and for other equitable relief.

12.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and 28 U.S.C. § 1331.

13. Defendant, directly and indirectly, made use of the mails, and the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

14. Venue is proper in this Court because Defendant resides in the Southern District of Alabama.

## THE DEFENDANT AND OTHER RELEVANT PARTY

15. James O. Ward, Jr., age 47, is a resident of Foley, Alabama. Ward has no disciplinary history with the Commission.

16. In a consent order entered with the Commodity Futures Trading Commission ("CFTC") in March 2022, Ward admitted that, between at least May 2017 and August 2017, he engaged in a Ponzi scheme in which he used a website to solicit over $20 million of investments. Ward also later advised a colleague to destroy evidence in response to a subpoena from the FTC relating to the Ponzi scheme.

17. Apex Financial Institute Pvt. Ltd. was a private fund formed by Ward and two other individuals in February 2021. Apex was formed as a British Virgin Islands entity.

18. Ward was responsible for marketing Apex to potential investors, including by making investor presentations. His two other partners handled Apex's administrative functions, such as recording transactions, executing money flows,

and technology and systems design.

19. According to a Form D signed by Ward and filed with the Commission in March 2021, Apex planned to offer "Pooled Investment Fund Interests."

20. Apex received at least $852,000 worth of crypto assets (valued at the time of transfer to Apex) in 2021, but has been defunct since 2022 and currently has no assets.

## The Apex Securities Offering

21. Apex began accepting investments in March 2021, and it operated for only approximately six months before winding down. During this time, Apex raised at least $852,000 worth of crypto assets (valued at the time of investment) from approximately 70 investors in the United States and abroad.

22. Apex investors did not enter into subscription agreements or similar documents, and did not receive limited partnership interests, membership interests, or other indicia of investments typically associated with private funds.

23. Rather, to invest with Apex, each investor created an account on Apex's website and received a unique crypto asset address to which they sent crypto assets as part of their investment with Apex. Once received by Apex, investments were credited to investors' accounts in the U.S. dollar value equivalent to the value of the crypto asset at the time of investment, and investors' account balances were

displayed in U.S. dollars.

24.     Once they invested with Apex, investors could choose to allocate their investments into three different trading strategies, in which investments would be pooled and managed by Apex. Each trading strategy had a corresponding lock-up period of 90, 180, or 365 days, with purported increasing potential daily returns based on the selected strategy and lock-up period.

25.     Investors relied completely on Apex to make investment decisions within each strategy. Internally, investment decisions were managed primarily by Ward's two partners.

26.     Apex did not receive any up-front fees, nor did it charge management fees. Rather, Apex was to receive 30% of investor profits.

**Ward's Fraudulent Misrepresentations and Omissions to Entice Investors**

27.     Ward's primary responsibility for Apex was soliciting investors.

28.     To that end, Ward live-streamed several Apex investor presentations, and then posted the videos on YouTube and made them publicly available.

29.     Ward's presentations were replete with material misrepresentations and materially misleading omissions concerning, among other things, Apex and its history, the nature of investments in Apex, and historical returns achieved by Apex.

30.     For example, in videos made available to potential investors in March and April 2021, Ward promoted Apex as "an actual hedge fund" and falsely

represented that Apex had offices *"*getting started in Dubai and Cyprus, [and] we'll also have one in Sweden."

32. In reality, while Apex hoped to open offices at some point, it never had any offices; rather, it was run remotely out of the homes of its three principals.

32. In the March and April 2021 videos, Ward also claimed that Apex was "regulated, actually regulated by the SEC," and added "when is the last time you heard someone come out and say that on a call like this? I would say probably never."

33. In fact, Apex was never a Commission-regulated entity and, other than filing a Form D, Apex never interacted with the Commission or its staff.

34. In the March and April 2021 videos, Ward used a PowerPoint presentation that also claimed, "In 2020, even during the pandemic, and in up/down/sideways markets, Apex's staking strategies outperformed the market."

35. In reality, Apex did not exist in 2020 and conducted no trading in 2020.

36. Apex's claimed 2020 success was based on purported returns represented to Apex by one or more of the third-party funds in which it intended to invest Apex's offering proceeds.

37. In the March and April 2021 videos, Ward also touted that Apex had successfully conducted a 12-month "beta test" with "over $25 million under management."

38. In reality, Apex did not exist prior to February 2021, had only been operational for one month at the time, had no assets under management prior to taking on investor funds, never had even $2.5 million—let alone $25 million—in assets under management, and never conducted a beta test.

39. Again, the claimed "beta test" related to purported returns experienced by one of the third-party funds in which Apex intended to invest offering proceeds.

40. In the March and April 2021 videos, Ward further claimed that Apex had developed trading strategies in crypto assets, commodities, real estate, and other assets that eliminated any risk of loss for investors.

41. Among other things, Ward represented that:

- Investors "get to participate in the upside without that downside potential."

- "Someone puts in $10,000 into Apex, and as it steadily grows, it may have some up days, it may have some zero days, but you're never going to look at your account and it's going to be under that $10,000 mark."; and

- "What makes Apex so special and what really protects us against those down days . . . you remember me telling you there's no down days . . . the way that that protection takes place is through the aggregation and the allocation of the assets that we have inside of this platform . . . . We work with the best of the best to be able to create this and our asset allocation, the way that we aggregate these funds as they come in, is what not only creates that upside potential that you saw, right, on the ROI, but it also protects you from the downside. You have to truly understand how powerful this is."

42. In reality, Apex had not developed any particular asset-allocation or aggregation models or trading strategies, let alone strategies that protected investors from losses.

43. In addition to these misrepresentations, one of the claimed hallmarks of Apex's structure, at least as initially pitched to investors by Ward, was the Apex Financial Token, or AFT, which Ward claimed was a "non-speculative," non-tradeable utility token.

44. Ward further represented "one AFT equals one U.S. dollar, and that is the way that it stays," and that Apex's use of AFT "takes the volatility out of the equation" so "you're not going to have to worry about that fluctuation in your value."

45. AFT, however, never existed and nothing about the fictitious token was pegged to the dollar.

46. One of Ward's Apex partners told Ward to stop referencing AFT after learning that Ward had used it in marketing Apex.

47. Ward also touted his own reputation, credibility, and integrity to potential investors, assuring them, "anyone who knows me, knows that I'm not gonna put my face in front of something, I'm not gonna . . . be part of anything that, number one, could potentially get me in trouble, and number two, is not real. I'm just not going to do it. It's not worth it."

48. Ward failed to disclose, however, that he had participated in a fraudulent Ponzi scheme in 2017 or that, in 2018, he directed a colleague to destroy evidence in response to a subpoena from the FTC related to that scheme.

49. In 2022, after Apex had ceased operations, Ward admitted in a CFTC order that he, along with accomplices, operated this Ponzi scheme and that he directed an accomplice to destroy evidence in response to a subpoena from the FTC.

## Apex Loses Money and Closes Down

50. Apex initially placed investor money with two outside funds, one that engaged in commodity trading and another that engaged in high-frequency, crypto-asset trading.

51. Apex's investment in the commodity trading fund incurred losses of 80%; the investment in the high-frequency crypto-asset trading was never deployed by that fund because it was in the process of restructuring.

52. In September 2021, Ward told his two partners that he was under investigation by the CFTC because he was involved in something that might be a Ponzi scheme and that "it was bad."

53. As a result of Ward's revelation, along with the investment losses and other operational issues, Ward's two partners decided to shut down Apex.

54. Because some of Apex's largest investors were friends, business partners, and neighbors of Ward's two partners, the two partners decided to use their

own assets in an effort to make Apex investors whole.

55. Ward did not contribute any of the money used to repay investors.

56. The repayment process began around September 2021 and continued until around April 2022.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

57. Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

58. Between at least March and September 2021, Defendant, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

59. Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and artifices to defraud.

60. By reason of the foregoing, Defendant, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Section 17(a)(3) of the Securities Act
### [15 U.S.C. § 77*q*(a)(3)]

61.  Paragraphs 1 through 56 are hereby realleged and incorporated herein by reference.

62.  Between at least March and September 2021, Defendant, acting knowingly, recklessly, or negligently in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

63.  By reason of the foregoing, Defendant, directly and indirectly, violated and, unless enjoined, will continue to violate Section 17(a)(3) of the Securities Act [15 U.S.C. § 77*q*(a)(3)].

## COUNT III – FRAUD

### Violations of Section 10(b) of the Exchange Act and
### Sections (a), (b), and (c) of Rule 10b-5 thereunder
### [15 U.S.C. § 78*j*(b) and 17 C.F.R. §§ 240.10b-5(a), (b), and (c)]

64.  Paragraphs 1 through 56 are hereby re-alleged and are incorporated herein by reference.

65. Between at least March and September 2021, Defendant, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a. employed devices, schemes, and artifices to defraud;

    b. made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c. engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

66. Defendant knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.

67. By reason of the foregoing, Defendant, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78$j$(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendant committed the violations alleged;

### II.

An order permanently restraining and enjoining Defendant, his officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78$j$(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77$q$(a)(1), (a)(3)], by engaging in the type of conduct alleged in the complaint;

### III.

An order, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78$u$(d)(5)], permanently enjoining Ward from directly or indirectly, including, but not limited to, through any entity owned or controlled by Ward, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities listed on a national securities exchange for his own personal accounts;

## IV.

An order, pursuant to Sections 21(d)(2) and (d)(5) of the Exchange Act [15 U.S.C. §§ 78$u$(d)(1), (5)] permanently barring Defendant from acting as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78$l$], or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78$o$];

## V.

An order pursuant to Section 21(d) of the Exchange Act [15 U.S.C. § 78$u$(d)] and Section 20(d) of the Securities Act [15 U.S.C. § 77$t$(d)] imposing civil penalties against Defendant; and

## VI.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY TRIAL DEMAND**

The Commission hereby demands a trial by jury as to all issues that may be so tried.

This 10th day of September, 2024.

                        Respectfully submitted,

                        /s/*Pat Huddleston II*
                        Pat Huddleston II
                        Senior Trial Counsel
                        Georgia Bar No. 373984
                        huddlestonp@sec.gov

                        M. Graham Loomis
                        Regional Trial Counsel
                        Georgia Bar No. 457868
                        loomism@sec.gov

                        Attorneys for Plaintiff
                        Securities and Exchange Commission
                        950 East Paces Ferry Road, NE, Suite 900
                        Atlanta, GA 30326
                        Tel: (404) 842-7600
                        Facsimile: *4048427679@fax.sec.gov*